**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GAYLE BURGE, ANA LAMAIRE, NATANYA POPE, and NORBERTO CLAUDIO, individually, and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | **CLASS REPRESENTATION** |
| COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION and TRIZETTO PROVIDER SOLUTIONS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Gayle Burge, Ana Lamaire, Natanya Pope, and Norberto Claudio ("Plaintiffs"), individually, and on behalf of all others similarly situated, bring this action against Defendants Cognizant Technology Solutions Corporation ("Cognizant"), and TriZetto Provider Solutions, LLC ("TriZetto") (collectively, "Defendants"). Plaintiffs bring this action by and through their attorneys, and allege, based upon personal knowledge as to their own actions, and based upon information and belief and reasonable investigation by their counsel as to all other matters, as follows:

## I.    INTRODUCTION

1.    Cognizant owns several companies which provide software solutions to healthcare providers, insurance companies, and other entities within the healthcare industry. TriZetto is one of Cognizant's wholly owned subsidiaries and it provides a variety of software solutions, including revenue cycle management programs.

2.      Thus, part of Cognizant and TriZetto's regular business activities involves collecting, maintaining, and storing vast quantities of highly sensitive "personally identifying information" ("PII") and "private health information" ("PHI") from its customers' patients, policyholders, and other members of the public–Plaintiffs and Class members.

3.      On October 2, 2025, TriZetto discovered suspicious activity in its systems and began an investigation. This investigation determined that unauthorized actors accessed its information systems and databases and stole Private Information belonging to Plaintiffs and Class members (the "Data Breach").

4.      Data Breach occurred because Defendants failed to implement reasonable security protections to safeguard their information systems and databases. And, as a result of the Data Breach, Plaintiffs and Class members suffered injuries including, but not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges;

- Time needed to investigate, correct and resolve unauthorized access to their accounts; time needed to deal with spam messages and e-mails received subsequent to the Data Breach;

- Charges and fees associated with fraudulent charges on their accounts; and

- The continued and increased risk of compromise to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect their Private Information.

5.      Accordingly, Plaintiffs bring this action on behalf of all those similarly situated to seek relief for the consequences of Defendants' failure to reasonably safeguard Plaintiffs' and Class members' Private Information; its failure to reasonably provide timely notification to Plaintiffs and Class members that their Private Information had been compromised; and for Defendants' failure to inform Plaintiffs and Class members concerning the status, safety, location, access, and protection of their Private Information.

## II.      PARTIES

### Plaintiff Gayle Burge

6.      Plaintiff Gayle Burge is a resident and citizen of Arizona. Plaintiff Burge is a patient of Tucson Orthopaedic Institute, which is a customer of Defendants. As such, Plaintiff Burge reasonably believes that her Private Information was compromised in the Data Breach.

### Plaintiff Ana Lamaire

7.      Plaintiff Ana Lamaire is a resident and citizen of Rhode Island. Plaintiff Lamaire has an active policy with Blue Cross Blue Shield of Rhode Island, which is a customer of Defendants. As such, Plaintiff Lamaire reasonably believes that her Private Information was compromised in the Data Breach.

### Plaintiff Natanya Pope

8.      Plaintiff Natanya Pope is a resident and citizen of California. Plaintiff Pope has an active policy with the San Francisco Health Plan, which is a customer of Defendants. As such, Plaintiff Pope reasonably believes that her Private Information was compromised in the Data Breach.

**Plaintiff Nolberto Claudio**

9.      Plaintiff Nolberto Claudio is a resident and citizen of California. Plaintiff Claudio has an active policy with LA Care, which is a customer of Defendants. As such, Plaintiff Claudio reasonably believes that his Private Information was compromised in the Data Breach.

**Defendant Cognizant Technology Services Corporation**

10.     Defendant Cognizant Technology Services Corporation is a Delaware corporation with its principal place of business located at 300 Frank W Burr Blvd, Suite 600, Teaneck, NJ 07666. Defendant conducts business in New Jersey and throughout the United States.

**Defendant TriZetto Provider Solutions, LLC**

11.     Defendant TriZetto Provider Solutions is a limited liability corporation with its principal place of business located at 3300 Rider Trail S., Earth City, Missouri 63045. Defendant conducts business in New Jersey and throughout the United States.

### III.      JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

13.     This Court has personal jurisdiction over Defendants because Cognizant maintains its headquarters in the state of New Jersey, and because both Defendants regularly conduct business in this State.

4

14. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' and Class members' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Cognizant Technology Solutions and TriZetto Provider Solutions

15. Cognizant is an information technology company. In 2014, Cognizant acquired TriZetto.

16. TriZetto is a wholly owned subsidiary of Cognizant, which owns several other companies that provide software for healthcare providers nationally. Cognizant has operating revenue of $20 billion annually, and provides services (both on its own and through its subsidiaries) to thousands of medical practices throughout the country.

17. TriZetto is a healthcare technology company that provides software solutions to healthcare providers, insurance companies, and other entities within the healthcare industry.

18. To fulfill its purpose, Defendants collect, store, and process vast quantities of Private Information from their customers' patients. Its customers include health care providers all across the United States, both large and small, as well as insurance companies and state and municipal insurance institutions.

19. Upon information and belief, Defendants failed to implement necessary data security safeguards at the time of the Data Breach. This failure resulted in cybercriminals accessing the Private Information of Defendants' customers' patients, policyholders, and other individuals whose information was collected and stored by Defendants—Plaintiffs and Class members.

20. Plaintiffs and Class members made their Private Information available to Defendants with the reasonable expectation that any entity with access to this information would

keep that sensitive and personal information confidential and secure from illegal and unauthorized access. They similarly expected that, in the event of any unauthorized access, these entities would provide them with prompt and accurate notice.

21.    This expectation was objectively reasonable and based on an obligation imposed on Defendants by statute, regulations, industrial custom, and standards of general due care.

22.    Unfortunately for Plaintiffs and Class members, Defendants failed to carry out its duty to safeguard sensitive Private Information and provide adequate data security. As a result, it failed to protect Plaintiffs and Class members from having their Private Information accessed and stolen during the Data Breach.

**B.    <u>The Data Breach</u>**

23.    Presently, Defendants have provided little information regarding the Breach. According to their public statements, on October 2, 2025, suspicious activity was identified in a web portal used by some of TriZetto's customers to access TriZetto's systems. Further investigation determined that unauthorized actors had successfully infiltrated TriZetto's systems using this portal and accessed the following categories of information: names of patients and primary insureds, addresses, dates of birth, Social Security numbers, health insurance member numbers, Medicare beneficiary numbers, health insurer names, information about the primary insured or beneficiary, and other demographic health and health insurance information (collectively, "Private Information").

24.    TriZetto has not issued notification directly to affected individuals; instead, TriZetto notified its customers of the Data Breach and provided them with a list of all affected individuals, expecting that its customers will notify their patients and policyholders on TriZetto's behalf.

25.     While Defendants have not yet disclosed the number of individuals affected by the Data Breach, it is estimated, based on the size of Defendants and TriZetto's operations, that the Private Information belonging to millions of individuals was compromised in this incident.

**C.      Defendants' Many Failures Both Prior to and Following the Breach**

26.     Defendants collect and maintain vast quantities of Private Information belonging to Plaintiffs and Class members as part of its normal operations. The Data Breach occurred as direct, proximate, and foreseeable results of multiple failings on the part of Defendants.

27.     First, Defendants inexcusably failed to implement reasonable security protections to safeguard their information systems and databases.

28.     Second, Defendants failed to timely detect and stop this Breach before Private Information was accessed and compromised. Upon information and belief, Defendants should have detected and terminated the Breach sooner, which would have limited the severity of the Breach or prevented the exfiltration of Private Information altogether.

29.     Third, Defendants failed to inform the public that their data security practices were deficient and inadequate. Had Plaintiffs and Class members been aware that Defendants did not have adequate safeguards in place to protect such sensitive Private Information, they would have taken steps to prevent their Private Information from being provided to Defendants.

30.     In addition to the failures that lead to the successful breach, Defendants' failings in handling the breach and responding to the incident exacerbated the resulting harm to the Plaintiffs and Class members.

31.     First, Defendants have declined to notify affected individuals of the Breach, relying instead on its customers to gather necessary information and notify their own patients and policyholders.

32.     Second, while Defendants have publicly stated that they will cover the cost of complimentary credit monitoring, fraud consultation, and identity theft restoration services, such services are woefully inadequate. Plaintiffs' and Class members' Private Information was accessed and acquired by cybercriminals for the express purpose of misusing the data. As a consequence, they face the real, immediate, and likely danger of identity theft and misuse of their Private Information. And this can, and in some circumstances already has, caused irreparable harm to their personal, financial, reputational, and future well-being.

33.     Defendants' myriad failures, including the failure to timely detect an intrusion and failure to notify Plaintiffs and Class members that their personal information had been stolen, allowed unauthorized individuals to access, misappropriate, and misuse Plaintiffs' and Class members' Private Information before victims could take proactive steps to defend themselves and mitigate the near- and long-term consequences of the Data Breach.

**D.     Data Breaches Pose Significant Threats**

34.     Data breaches have become a constant threat that, without adequate safeguards, can expose personal data to malicious actors. It is well known that PII, and Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

35.     The Identity Theft Resource Center's ("ITRC") Annual End-of-Year Data Breach Report for 2024 listed 3,158 total compromises, for which 1,350,835,988 individual victim notices were dispatched.[1] This is just 57 breaches short of 2023's record-breaking total of 3,205 data breaches.[2] But the astronomical figure of 1,350,835,988 victim notices represents a 211% increase

---

[1] *2024 Data Breach Report*, Identity Theft Resource Center (January 2025), available at https://www.idtheftcenter.org/publication/2024-data-breach-report/.
[2] *2023 Data Breach Report*, Identity Theft Resource Center (January 2023), available at https://www.idtheftcenter.org/publication/2023-data-breach-report/.

over 2023's 353,027,892 victim notices, primarily due to five "mega-breaches" (breaches involving at least 100 million victims) which took place in 2024.[3]

36.    The HIPAA Journal's 2024 Health Care Data Breach Report noted 725 data breaches involving 500 or more healthcare records.[4] In 2023, there were 747 compromises involving healthcare data and 720 in 2022.

37.    Statista, a German entity that collects and markets data relating to data breach incidents and the consequences thereof, confirms that the number of data breaches has been steadily increasing since it began a survey of data compromises in 2005 with 157 compromises reported that year, to a peak of 3,205 in 2023.[5] The number of impacted individuals has also risen precipitously from approximately 318 million in 2015 to 1.35 billion in 2024.



Figure 1 – _Number of Data Breaches and Affected Individuals from 2005 to 2024._ [6]

---

[3] _2024 Data Breach Report_, Identity Theft Resource Center (Jan. 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/; _2023 Data Breach Report_, Identity Theft Resource Center (Jan. 2023), https://www.idtheftcenter.org/publication/2023-data-breach-report/.
[4] Steve Adler, 2024 Healthcare Data Breach Report, The HIPAA Journal (January 30, 2025), available at https://www.hipaajournal.com/december-2023-healthcare-data-breach-report/.
[5] _Annual Number of Data Breaches and Exposed Records in the United States from 2005 to 2024_, Statista (Updated May 23, 2025), available at: https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed.
[6] _Id._

38.     This stolen PII is then routinely traded on dark web black markets as a simple commodity, with online banking login information costing an average of $100, full credit card details and associated details costing between $10 and $100, and comprehensive data packages enabling complete identity theft selling for $1,000.[7]

39.     In addition, the severity of the consequences of a compromised social security number belies the ubiquity of stolen numbers on the dark web. Criminals and other unsavory groups can fraudulently take out loans under the victims' name, open new lines of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[8]

This is exacerbated by the fact that the problems arising from a compromised social security number are exceedingly difficult to resolve. A victim is forbidden from proactively changing his or her number unless and until it is actually misused and harm has already occurred. And even this delayed remedial action is unlikely to undo the damage already done to the victims:

> Keep in mind that a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a

---

[7] Ryan Smith, *Revealed-how much is personal information worth on the dark web?*, Insurance News (May 1, 2023), available at https://www.insurancebusinessmag.com/us/news/breaking-news/revealed--how-much-is-personal-information-worth-on-the-dark-web-444453.aspx.
[8] United States Social Security Administration, *Identity Theft and Your Social Security Number*, United States Social Security Administration (July 2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

fresh start. This is especially true if your other personal information, such as your name and address, remains the same.[9]

40.    Further, as data breaches become ever more prevalent and as technology advances, computer programs can scan the internet to create a mosaic of information that could be used to link compromised information to an individual in ways in a phenomenon known as the "mosaic effect." By and through this process, names, dates of birth, and contact information such as telephone numbers and email addresses, hackers and identity thieves can access users' other accounts by, for example, bypassing security questions and 2FA security with the comprehensive collection of information at their disposal.

41.    Thus, because of this effect, cybercriminals and other unauthorized parties could use Plaintiffs' and Class Members' Private Information to access, inter alia, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiffs and Class Members, even when that specific category of information is not compromised in a given breach.

42.    A particularly trouble example of this effect is the development of "Fullz" packages. A "Fullz" packages is a dosser of information that cybercriminals and other unauthorized parties can assemble by cross-referencing the Private Information compromised in a given data breach to publicly available data or data compromised in other data breaches. Automated programs can and are routinely used to create these dossiers and they typically represent an alarmingly accurate and complete profile of a given individual.

43.    Therefore, through the use of these "Fullz" packages, stolen Private Information from this Data Breach can be easily linked to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other sources and identifiers. Thus, even if certain information such as emails, phone numbers, or credit card or financial account were not compromised in this Data Breach,

---

[9] *Id.*

criminals can easily create a Fullz package to sell for profit.

44.     Upon information and belief, this has already transpired (and will continue to transpire) for Plaintiffs and the Class. And any reasonable for any trier of fact will find that Plaintiffs and other Class Members' stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

45.     The most sought after and expensive information on the dark web are stolen medical records which command prices from $250 to $1,000 each.[10] Medical records are considered the most valuable because unlike credit cards, which can easily be canceled, and social security numbers, which can be changed, medical records contain "a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information."[11] With this bounty of ill-gotten information, cybercriminals can steal victims' public and insurance benefits and bill medical charges to victims' accounts.[12] Cybercriminals can also change the victims' medical records, which can lead to misdiagnosis or mistreatment when the victims seek medical treatment.[13] Victims of medical identity theft could even face prosecution for drug offenses when cybercriminals use their stolen information to purchase prescriptions for sale in the drug trade.[14]

---

[10] Paul Nadrag, Capsule Technologies, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, Fierce Healthcare (January 26, 2021), available at: https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[11] *Id.*

[12] *Medical Identity Theft in the New Age of Virtual Healthcare*, IDX (March 15, 2021), available at https://www.idx.us/knowledge-center/medical-identity-theft-in-the-new-age-of-virtual-healthcare. *See also* Michelle Andrews, *The Rise of Medical Identity Theft*, Consumer Reports (August 25, 2016), available at https://www.consumerreports.org/health/medical-identity-theft-a1699327549/; *Data Breaches: In the Healthcare Sector*, CTR. FOR INTERNET SEC., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited December 1, 2024).

[13] *Id.*

[14] *Id.*

46.     The wrongful use of compromised medical information is known as medical identity theft and the damage resulting from medical identity theft is routinely far more serious than the harm resulting from the theft of simple PII. Victims of medical identity theft spend an average of $13,500 to resolve problems arising from medical identity theft and there are currently no laws limiting a consumer's liability for fraudulent medical debt (in contrast, a consumer's liability for fraudulent credit card charges is capped at $50).[15] It is also "considerably harder" to reverse the damage from the aforementioned consequences of medical identity theft.[16]



Figure 2 – *Number of Individuals Affected by Healthcare Data Breaches from 2009 to 2024.*[17]

47.     In light of the dozens of high-profile health and medical information data breaches that have been reported in recent years, entities like Defendants charged with maintaining and securing PII and PHI should know the importance of protecting that information from unauthorized disclosure. Indeed, Defendants knew, or certainly should have known, of the recent and high-profile data breaches in the health care industry: UnityPoint Health, Lifetime Healthcare, Inc., Community Health Systems, Kalispell Regional Healthcare, Anthem, Premera Blue Cross, and many others.[18]

---

[15] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.
[16] *Id.*
[17] Steve Adler, 2024 Healthcare Data Breach Report, The HIPAA Journal (January 30, 2025), available at https://www.hipaajournal.com/december-2023-healthcare-data-breach-report/.
[18] *See, e.g.*, Steve Adler, *Healthcare Data Breach Statistics*, HIPAA Journal (November 25, 2024), available at: https://www.hipaajournal.com/healthcare-data-breach-statistics.

48.     In addition, the Federal Trade Commission ("FTC") has brought dozens of cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data, including recent cases concerning health-related information against LabMD, Inc., SkyMed International, Inc., and others. The FTC publicized these enforcement actions to place companies like Defendants on notice of their obligation to safeguard consumer and patient information.[19]

49.     Given the nature of Defendants' Data Breach, as well as the length of the time Defendants' networks were breached and the long delay in notification to victims thereof, it is foreseeable that the compromised Private Information has been or will be used by hackers and cybercriminals in a variety of devastating ways. Indeed, the cybercriminals who possess Plaintiffs' and Class members' Private Information can easily obtain Plaintiffs' and Class members' tax returns or open fraudulent credit card accounts in Class members' names.

50.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, because credit card victims can cancel or close credit and debit card accounts.[20] The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

51.     Despite the prevalence of public announcements of data breach and data security compromises, its own acknowledgment of the risks posed by data breaches, and its own

---

[19] *See, e.g.*, *In the Matter of SKYMED INTERNATIONAL, INC.*, C-4732, 1923140 (F.T.C. Jan. 26, 2021).
[20] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, Forbes (Mar 25, 2020), available at https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1. *See also Why Your Social Security Number Isn't as Valuable as Your Login Credentials*, Identity Theft Resource Center (June 18, 2021), available at https://www.idtheftcenter.org/post/why-your-social-security-number-isnt-as-valuable-as-your-login-credentials/.

acknowledgment of its duties to keep Private Information private and secure, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class members from misappropriation. As a result, the injuries to Plaintiffs and Class members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for Plaintiffs and Class members.

**E.    Defendants Had a Duty and Obligation to Protect Private Information**

52.    Defendants have an obligation to protect the Private Information belonging to Plaintiffs and Class members. First, this obligation was mandated by government regulations and state laws, including HIPAA and FTC rules and regulations. Second, this obligation arose from industry standards regarding the handling of sensitive PII and medical records. Third, Defendants imposed such an obligation on themselves with their promises regarding the safe handling of data. Plaintiffs and Class members provided, and Defendants obtained, their information on the understanding that it would be protected and safeguarded from unauthorized access or disclosure.

**1.    HIPAA Requirements and Violation**

53.    HIPAA requires, *inter alia*, that Covered Entities and Business Associates implement and maintain policies, procedures, systems and safeguards that ensure the confidentiality and integrity of consumer and patient PII and PHI, protect against any reasonably anticipated threats or hazards to the security or integrity of consumer and patient PII and PHI, regularly review access to data bases containing protected information, and implement procedures and systems to detect, contain, and correct any unauthorized access to protected information. *See* 45 CFR § 164.302, *et seq.*

54.    HIPAA, as applied through federal regulations, also requires private information to be stored in a manner that renders it, "unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology. . . ." 45 CFR § 164.402.

55.    The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires entities to provide notice of a data breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***" (emphasis added).

56.    Defendants failed to implement and/or maintain procedures, systems, and safeguards to protect the Private Information belonging to Plaintiffs and Class members from unauthorized access and disclosure.

57.    Upon information and belief, Defendants' security failures include, but are not limited to:

    a.    Failing to maintain an adequate data security system to prevent data loss;

    b.    Failing to mitigate the risks of a data breach and loss of data;

    c.    Failing to ensure the confidentiality and integrity of electronic protected health information Defendants create, receive, maintain, and transmit in violation of 45 CFR 164.306(a)(1);

    d.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

    e.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

    f.    Failing to identify and respond to suspected or known security incidents;

    g.    Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.      Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.      Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce, in violation of 45 CFR 164.306(a)(94); and

k.      Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

58.     Upon information and belief, Defendants also failed to store the information they collected in a manner that rendered it, "unusable, unreadable, or indecipherable to unauthorized persons," in violation of 45 CFR § 164.402.

59.     Defendants also violated the HIPAA Breach Notification Rule since they did not inform Plaintiffs and Class members about the breach within 60 days of discovering the Breach.

**2.      FTC Act Requirements and Violations**

60.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

61.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and

practices for business.[21] The guidelines note businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23] Defendants clearly failed to do any of the foregoing, as evidenced by the length of the Data Breach, the fact that the Breach went undetected, and the amount of data exfiltrated.

62.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

63.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[21] *Protecting Personal Information: A Guide for Business*, Federal Trade Comm'n (October 2016), available at https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last accessed August 15, 2023).
[22] *Id.*
[23] *Id.*

64.    Additionally, the FTC Health Breach Notification Rule obligates companies that suffered a data breach to provide notice to every individual affected by the data breach, as well as notifying the media and the FTC. *See* 16 CFR 318.1, *et seq.*

65.    As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

66.    Defendants were fully aware of their obligation to protect the Private Information of Plaintiffs and Class members, as Defendants are sophisticated software technology companies operating in the healthcare sector.

67.    Defendants had and continue to have a duty to exercise reasonable care in collecting, storing, and protecting the Private Information from the foreseeable risk of a data breach. The duty arises out of the special relationship that exists between Defendants and Plaintiffs and Class members. Defendants alone had the exclusive ability to implement adequate security measures to its cyber security network to secure and protect Plaintiffs' and Class members' Private Information.

### 3.    Industry Standards and Noncompliance

68.    As noted above, experts studying cybersecurity routinely identify businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

69.    Some industry best practices that should be implemented by businesses dealing with sensitive Private Information, like Defendants, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and

anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

70.    Other best cybersecurity practices that are standard in the industry include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

71.    Defendants should have also followed the minimum standards of any one of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

72.    Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

### 4.    <u>Defendants' Own Stated Policies and Promises</u>

73.    In the "General Terms" of the contracts between TriZetto and its clients, TriZetto bound itself to safeguarding data: "Safeguards; HIPAA Rules. TriZetto will use reasonable and appropriate safeguards . . . since this Agreement contemplates the exchange of Private Health Information between the parties. . ."[24]

---

[24] *General Terms*, TriZetto Provider Solutions, available at https://www.trizettoprovider.com/wp-content/uploads/GeneralTerms05232017.pdf (last accessed December 22, 2025).

74.     Defendants failed to live up to their own stated policies and promises with regards to data privacy and data security as cybercriminals were able to infiltrate its systems and steal the Private Information belonging to Plaintiffs and Class members.

**F.      Plaintiffs and the Class Suffered Harm Resulting from the Data Breach**

75.     Like any data hack, the Data Breach presents major problems for all affected.[25]

76.     The FTC warns the public to pay particular attention to how they keep personally identifying information including Social Security numbers and other sensitive data. As the FTC notes, "once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[26]

77.     The ramifications of Defendants' failure to properly secure Plaintiffs' and Class members' Private Information are severe. Identity theft occurs when someone uses another person's financial, and personal information, such as that person's name, address, Social Security number, and other information, without permission in order to commit fraud or other crimes.

78.     According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.

79.     Furthermore, PII has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

80.     Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiffs and the Class at an imminent, immediate, and continuing

---

[25] Paige Schaffer, *Data Breaches' Impact on Consumers*, Insurance Thought Leadership (July 29, 2021), available at https://www.insurancethoughtleadership.com/cyber/data-breaches-impact-consumers.
[26] *Warning Signs of Identity Theft*, Federal Trade Comm'n, available at https://www.identitytheft.gov/#/Warning-Signs-of-Identity-Theft.

increased risk of identity theft and identity fraud. According to a recent study published in the scholarly journal *Preventive Medicine Reports*, public and corporate data breaches correlate to an increased risk of identity theft for victimized consumers.[27] The same study also found that identity theft is a deeply traumatic event for the victims, with more than a quarter of victims still experiencing sleep problems, anxiety, and irritation even six months after the crime.[28]

81.    There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals who now possess Class members' Private Information will do so at a later date or re-sell it.

82.    Data breaches have also proven to be costly for affected organizations as well, with the average cost to resolve being $4.45 million dollars in 2023.[29] The average cost to resolve a data breach involving health information, however, is more than double this figure at $10.92 million.[30]

83.    The theft of medical information, beyond the theft of more traditional forms off PII, is especially harmful for victims. Medical identity theft, the misuse of stolen medical records and information, has seen a seven-fold increase over the last five years and this explosive growth far outstrips the increase in incidence of traditional identity theft.[31] Medical Identity Theft is especially

---

[27] David Burnes, Marguerite DeLiema, Lynn Langton, *Risk and protective factors of identity theft victimization in the United States*, Preventive Medicine Reports, Volume 17 (January 23, 2020), available at https://www.sciencedirect.com/science/article/pii/S2211335520300188?via%3Dihub.
[28] *Id.*
[29] *Cost of a Data Breach Report 2023*, IBM Security, available at https://www.ibm.com/reports/data-breach?utm_content=SRCWW&p1=Search&p4=43700072379268622&p5=p&gclid=CjwKCAjwxOymB hAFEiwAnodBLGiGtWfjX0vRlNbx6p9BpWaOo9eZY1i6AMAc6t9S8IKsxdnbBVeUbxoCtk8QAvD_B wE&gclsrc=aw.ds.
[30] *Id.*
[31] Medical Identity Theft, AARP (March 25, 2022), available at: https://www.aarp.org/money/scams-fraud/info-2019/medical-identity-theft.html.

nasty for victims because of the lack of laws that limit a victim's liabilities and damages from this type of identity theft (e.g., a victim's liability for fraudulent credit card charges is capped at $50), the unalterable nature of medical information, the sheer costs involved in resolving the fallout from a medical identity theft (victims spend, on average, $13,500 to resolve problems arising from this crime), and the risk of criminal prosecution under anti-drug laws.[32]

84.    Here, due to the Breach, Plaintiffs and Class members have been exposed to injuries that include, but are not limited to:

a.    Theft of Private Information;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of financial accounts as a direct and proximate result of the Private Information stolen during the Data Breach;

c.    Damages arising from the inability to use accounts that may have been compromised during the Data Breach;

d.    Costs associated with time spent to address and mitigate the actual and future consequences of the Data Breach, such as finding fraudulent charges, cancelling and reissuing payment cards, purchasing credit monitoring and identity theft protection services, placing freezes and alerts on their credit reports, contacting their financial institutions to notify them that their personal information was exposed and to dispute fraudulent charges, imposition of withdrawal and purchase limits on compromised accounts, including but not limited to lost productivity and opportunities, time taken from the enjoyment of one's life, and the inconvenience, nuisance, and annoyance of dealing with all issues resulting from the Data Breach, if they were fortunate enough to learn of the Data Breach despite Defendants' delay in disseminating notice in accordance with state law;

e.    The imminent and impending injury resulting from potential fraud and identity theft posed because their Private Information is exposed for theft and sale on the dark web; and

f.    The loss of Plaintiffs' and Class members' privacy.

---

[32] *Id.*

85.    Plaintiffs and Class members have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their Private Information being accessed by cybercriminals.

86.    As a direct and proximate result of Defendants' acts and omissions in failing to protect and secure Private Information, Plaintiffs and Class members have been placed at a substantial risk of harm in the form of identity theft, and they have incurred and will incur actual damages in an attempt to prevent identity theft.

87.    Plaintiffs retain an interest in ensuring there are no future breaches, in addition to seeking a remedy for the harms suffered as a result of the Data Breach on behalf of both themselves and similarly situated individuals whose Private Information was accessed in the Data Breach.

## G.    EXPERIENCES SPECIFIC TO PLAINTIFFS

### Plaintiff Gayle Burge

88.    Plaintiff Burge has an active policy with the Tucson Orthopaedic Institute, which is a customer of TriZetto. As such, Plaintiff Burge reasonably believes that her Private Information was compromised in the Breach.

89.    After the Breach, Plaintiff Burge experienced a dramatic increase in the number of spam calls and emails.

90.    As a result of the Data Breach, Plaintiff Burge has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Burge has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

91.    As a result of the Data Breach, Plaintiff Burge has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Burge is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

92.    Plaintiff Burge suffered actual injury from her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

93.    As a result of the Data Breach, Plaintiff Burge anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

### Plaintiff Anna Lamaire

94.    Plaintiff Lamaire has an active policy with Blue Cross Blue Shield of Rhode Island, which is a customer of TriZetto. As such, Plaintiff Lamaire reasonably believes that her Private Information was compromised in the Breach.

95.    After the Breach, Plaintiff Lamaire experienced a dramatic increase in the number of spam calls and emails.

96.    As a result of the Data Breach, Plaintiff Lamaire has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach

and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Lamaire has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

97.     As a result of the Data Breach, Plaintiff Lamaire has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Lamaire is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

98.     Plaintiff Lamaire suffered actual injury from her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

99.     As a result of the Data Breach, Plaintiff Lamaire anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

**_Plaintiff Natanya Pope_**

100.     Plaintiff Pope has an active policy with the San Francisco Health Plan, which is a customer of TriZetto. As such, Plaintiff Pope reasonably believes that her Private Information was compromised in the Breach.

101.    After the Breach, Plaintiff Pope experienced a dramatic increase in the number of spam calls and emails.

102.    As a result of the Data Breach, Plaintiff Pope has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Pope has also spent several hours dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including, but not limited to, work and recreation.

103.    As a result of the Data Breach, Plaintiff Pope has suffered anxiety due to the public dissemination of her personal information, which she believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using her Private Information for purposes of identity theft and fraud. Plaintiff Pope is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

104.    Plaintiff Pope suffered actual injury from her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of her Private Information, a form of property that Defendants obtained from her; (b) violation of her privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

105.    As a result of the Data Breach, Plaintiff Pope anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, she is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

*Plaintiff Nolberto Claudio*

106.    Plaintiff Claudio has an active policy with LA Care, which is a customer of TriZetto. As such, Plaintiff Claudio reasonably believes that his Private Information was compromised in the Breach.

107.    After the Breach, Plaintiff Claudio experienced a dramatic increase in the number of spam calls and emails.

108.    As a result of the Data Breach, Plaintiff Claudio has made reasonable efforts to mitigate the impact of the Data Breach, including, but not limited to, researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud.

109.    Plaintiff Claudio has also spent several hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including, but not limited to, work and recreation.

110.    As a result of the Data Breach, Plaintiff Claudio has suffered anxiety due to the public dissemination of his personal information, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and using his Private Information for purposes of identity theft and fraud. Plaintiff Claudio is concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

111.    Plaintiff Claudio suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his Private Information, a form of property that Defendants obtained

from him; (b) violation of his privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

112.    As a result of the Data Breach, Claudio anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. And, as a result of the Data Breach, he is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

## V.    CLASS REPRESENTATION ALLEGATIONS

113.    Plaintiffs bring this action on behalf of themselves and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States whose Private Information was accessed in the Data Breach.

Excluded from the Class are Defendants, their executives and officers, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change or expand the Class definition after conducting discovery.

114.    Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process. On information and belief, the number of affected individuals estimated to be in the hundreds of thousands to millions based on the size of Defendants' operations. The members of the Class will be identifiable through information and records in Defendants' possession, custody, and control.

115.    Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over

the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.      When Defendants learned of the Data Breach;

b.      Whether hackers obtained Class members' Private Information via the Data Breach;

c.      Whether Defendants' response to the Data Breach was adequate;

d.      Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

e.      Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

f.      Whether Defendants owed a duty to safeguard their Private Information;

g.      Whether Defendants breached their duty to safeguard Private Information;

h.      Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

i.      Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiffs and Class members;

j.      Whether Defendants' conduct violated the FTCA and/or HIPAA;

k.      Whether Defendants' conduct was negligent;

l.      Whether Defendants' conduct was *per se* negligent;

m.      Whether Defendants were unjustly enriched;

n.      What damages Plaintiffs and Class members suffered as a result of Defendants' misconduct;

o.      Whether Plaintiffs and Class members are entitled to actual and/or statutory damages; and

p.      Whether Plaintiffs and Class members are entitled to additional credit or identity monitoring and monetary relief.

116.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class as Plaintiffs and all members of the Class had their Private Information compromised in the Data Breach. Plaintiffs' claims and damages are also typical of the Class because they resulted from Defendants' uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled to is typical of the Class because Defendants have acted, and refused to act, on grounds generally applicable to the Class.

117.    <u>Adequacy</u>: Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their counsel have any interests that are antagonistic to the interests of other members of the Class.

118.    <u>Superiority</u>: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendants' records and databases.

## VI.    CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(By Plaintiffs on behalf of the Class)**

119.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

120.    Defendants owe a duty of care to protect the Private Information belonging to Plaintiffs and Class members. Defendants also owe several specific duties including, but not limited to, the duty:

   a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in its possession;

   b.    to protect Private Information using reasonable and adequate security procedures and systems compliant with industry standards;

   c.    to have procedures in place to detect the loss or unauthorized dissemination of Private Information in its possession;

   d.    to employ reasonable security measures and otherwise protect the Private Information of Plaintiffs and Class members pursuant to the FTCA;

   e.    to implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

   f.    to promptly notify Plaintiffs and Class members of the Data Breach, and to precisely disclose the type(s) of information compromised.

121.    Defendants owe this duty because they had a special relationship with Plaintiffs' and Class members. Plaintiffs and Class members entrusted their Private Information to Defendants on the understanding that adequate security precautions would be taken to protect this information. Furthermore, only Defendants had the ability to protect their systems and the Private Information stored on them from attack.

122.    Defendants also owe this duty because industry standards mandate that Defendants protect Private Information in their care.

123.    Defendants also owe a duty to timely disclose any unauthorized access and/or theft of the Private Information belonging to Plaintiffs and Class members. This duty exists to provide Plaintiffs and Class members with the opportunity to undertake appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

124.    Defendants breached the duties owed to Plaintiffs and Class members by failing to take reasonable appropriate measures to secure, protect, and/or otherwise safeguard their Private Information.

125.    Defendants also breached the duties owed to Plaintiffs and Class members by failing to timely and accurately disclose to them that their Private Information had been improperly acquired and/or accessed.

126.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members were damaged. These damages include, and are not limited to:

- Lost or diminished value of their Private Information;

- Out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information;

- Lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to the loss of time needed to take appropriate measures to avoid unauthorized and fraudulent charges; and

- Permanent increased risk of identity theft.

127.    Plaintiffs and Class members were foreseeable victims of any inadequate security practices on the part of Defendants and the damages they suffered were the foreseeable result of the aforementioned inadequate security practices.

128.    In failing to provide prompt and adequate individual notice of the Data Breach, Defendants also acted with reckless disregard for the rights of Plaintiffs and Class members.

129.    Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

**COUNT II**
**NEGLIGENCE *PER SE***
**(By Plaintiffs on behalf of the Class)**

130.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

131.    Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, imposes a duty on Defendants to provide fair and adequate data security to secure, protect, and/or otherwise safeguard the Private Information of Plaintiffs and Class members.

132.    HIPAA imposes a duty on Defendants to implement reasonable safeguards to protect Plaintiffs' and Class members' Private Information. 42 U.S.C. § 1302(d), *et seq*.

133.    HIPAA also requires Defendants to render unusable, unreadable, or indecipherable all Private Information they collected. Defendants were required to do so through "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

134.    In the event of a data breach, HIPAA obligates Covered Entities and Business Associates to notify affected individuals, prominent media outlets, and the Secretary of the Department of Health and Human Services of the data breach without unreasonable delay and in no event later than 60 days after discovery of the data breach. 45 CFR § 164.400, *et seq.*

135.    Defendants violated the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to secure, protect, and/or otherwise safeguard Plaintiffs' and Class members' Private Information.

136.    Defendants violated HIPAA by failing to properly encrypt the Private Information they collected.

137.    Defendants violated HIPAA by unduly delaying reasonable notice of the actual breach.

138.    Defendants' failure to comply with HIPAA and the FTCA constitutes negligence *per se*.

139.    Plaintiffs and Class members are within the class of persons that the FTCA and HIPAA are intended to protect.

140.    It was reasonably foreseeable that the failure to protect and secure Plaintiffs' and Class members' Private Information in compliance with applicable laws and industry standards would result in that Information being accessed and stolen by unauthorized actors.

141.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to theft of their personal information, damages from the lost time and effort to mitigate the impact of the Data Breach, and permanently increased risk of identity theft.

142.    Plaintiffs and Class members are entitled to damages in an amount to be proven at trial and injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class members.

<u>**COUNT III**</u>
<u>**BREACH OF FIDUCIARY DUTY**</u>
**(By Plaintiffs on behalf of the Class)**

143.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

144.    Plaintiffs brings this claim on behalf of themselves and the Class.

145.    Plaintiffs and Class members provided their Private Information to Defendants in confidence with the reasonable belief that Defendants would protect their information. Plaintiff and Class members would not have provided their information to Defendants had they known they would fail to adequately protect their information.

146.    In collecting and maintaining this Private Information, Defendants created a fiduciary relationship between themselves and Plaintiff and Class members. As such, Defendants owed a duty to *primarily* act for the benefit of Plaintiffs and Class members upon matters within the scope of their relationship. This included a duty to protect Plaintiffs' and Class Members' Private Information.

147.    These fiduciary duties and responsibilities are also described under the procedures set forth in the HIPAA Privacy Rule, including the procedures and definitions found in 45 C.F.R. §160.103 and 45 C.F.R. §164.530, which requires Defendants to apply appropriate administrative, technical, and physical safeguards to protect the privacy of Private Information and keep it free from disclosure.

148.    Defendants breached these fiduciary duties by failing to implement adequate safeguards and causing Plaintiff's and Class members' Private Information to be disclosed to unauthorized third parties.

149.    As a direct and proximate result of Defendants' breaches of its fiduciary duties and the resulting disclosure of Plaintiffs and Class member's Private Information, Plaintiffs and Class

members have suffered damages, including, but not limited to exposure to heightened future risk

of identity theft, loss of privacy, confidentiality, and emotional distress. humiliation.

## COUNT IV
## INVASION OF PRIVACY
### (By Plaintiffs on behalf of the Class)

150.    Plaintiffs incorporate and reallege all allegations above as if fully set forth herein.

151.    Plaintiffs and Class members had a reasonable expectation of privacy in the Private

Information that Defendants possessed and/or continue to possess.

152.    By failing to keep Plaintiffs' and Class members' Private Information safe, and by

misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use,

Defendants invaded Plaintiffs' and Class members' privacy by:

      a.     Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

      b.     Publicizing private facts about Plaintiffs and Class members, which is highly offensive to a reasonable person.

153.    Defendants knew, or acted with reckless disregard of the fact that, a reasonable

person in Plaintiffs' position would consider Defendants' actions highly offensive.

154.    Defendants invaded Plaintiffs' and Class members' right to privacy and intruded

into Plaintiffs' and Class members' private affairs by misusing and/or disclosing their private

information without their informed, voluntary, affirmative, and clear consent.

155.    As a proximate result of such misuse and disclosures, Plaintiffs' and Class

members' reasonable expectation of privacy in their Private Information was unduly frustrated and

thwarted. Defendants' conduct amounted to a serious invasion of Plaintiffs' and Class members'

protected privacy interests.

156.    In failing to protect Plaintiffs' and Class members' Private Information, and in

misusing and/or disclosing their Private Information, Defendants have acted with malice and

oppression and in conscious disregard of Plaintiffs' and Class members' rights to have such information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of Plaintiffs and Class members. Plaintiffs, therefore, seek an award of damages, including punitive damages, on behalf of themselves and the Class.

<b><u>PRAYER FOR RELIEF</u></b>

WHEREFORE, Plaintiffs, individually, and on behalf of all members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.   That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel as Class Counsel;

B.   That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.   That the Court award Plaintiffs and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D.   That the Court award Plaintiffs and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E.   That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F.   That the Court award pre- and post-judgment interest at the maximum legal rate;

G.   That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.   That the Court grant all other relief as it deems just and proper.

<b><u>DEMAND FOR JURY TRIAL</u></b>

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Date: December 22, 2025                    Respectfully Submitted,

                                           /s/ Bryan L. Clobes
                                           Bryan L. Clobes
                                           Nickolas J. Hagman*
                                           Alex Lee*
                                           **CAFFERTY CLOBES MERIWETHER
                                           & SPRENGEL LLP**
                                           135 S. LaSalle, Suite 3210
                                           Chicago, Illinois 60603
                                           Telephone: (312) 782-4880
                                           Facsimile: (312) 782-4485
                                           bclobes@caffertyclobes.com
                                           nhagman@caffertyclobes.com
                                           alee@caffertyclobes.com

                                           * *Pro Hac Vice* forthcoming

                                           *Attorneys for Plaintiff and the Proposed Class*