**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| *In re: Cognizant/TriZetto Data Security Incident* | Case No.: 2:25-cv-18908-MCA-AME |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO
CONDUCT DISCOVERY WITH RESPECT TO DEFENDANTS' MOTION TO
TRANSFER CONSOLIDATED ACTIONS TO EASTERN DISTRICT OF MISSOURI**

NOW COME Plaintiffs,[1] individually, and on behalf of all others similarly situated, by and through counsel, and for their *Motion for Leave to Conduct Discovery With Respect to Defendants' Motion to Transfer Consolidated Actions to Eastern District of Missouri*, state as follows:

**I.      INTRODUCTION**

These consolidated cases arise from an October 2025 cybersecurity incident (the "Data Breach") involving Defendants Cognizant Technology Solutions Corporation ("Cognizant") and/or TriZetto Provider Solutions, LLC ("TPS" or "TriZetto") (collectively, "Defendants"). *See generally* Class Action Complaint filed in the *Burge* matter [Dkt. No. 1] ("Complaint"). During the Data Breach, cybercriminals successfully infiltrated Defendants' online platform and stole the sensitive personal information ("Private Information") of over 3.4 million individuals, including Plaintiffs and members of the putative Class. *Id*.

On May 6, 2026, Defendants filed their *Motion to Transfer Consolidated Actions to the Eastern District of Missouri* ("Motion to Transfer") requesting that these consolidated matters be

---

[1] Gayle Burge, Ana Lamaire, Natanya Pope, and Norberto Claudio, Melissa Trimble, Joanne Torkomian, Fatima Chaaban, Kathy Noble-Mayer, Marquintha Johnson, Lori DeLaRiva, Billy Simpson, Suzanna Elich, Ray Madoff, Felicia Billingslea, Michael Conrad, Charein Faraj, Michelle Ley, Stacey Marchand, Annabelle Patterson, Lisa Scorpio, Theresa Ilene, Harris Vaughn Marion Barnett, Jim Caldwell, John Wolf, Lana Whiteside, Shannon Lee, Joseph Sawyer, and Andrew Halcarz (collectively, "Plaintiffs").

transferred to the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a). *See* Motion to Transfer, Dkt. No. 54. In support of the Motion to Transfer, Defendants attach a declaration from TPS's Chief Operating Officer, Heather Donohue ("Donohue"), wherein Donohue makes several averments regarding TPS's business operations and its relationship to its parent company, Cognizant. *See generally* Declaration of Heather Donohue [Dkt. No. 54-1] ("Donohue Declaration"). As explained below, however, the assertions made in the Donohue Declaration fail to address key issues related to the propriety of transfer in this case. Plaintiffs oppose transfer of the consolidated action away from this Court. *See* Plaintiffs' Opposition to the Motion to Transfer, Dkt. No. 63. If the Court is not inclined to outright deny the Motion to Transfer, Plaintiffs should be given the opportunity to conduct discovery regarding these issues before the Motion to Transfer is decided.

II.    **ARGUMENT**

The Third Circuit's decision in *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3rd Cir. 1995), articulates several public and private interest factors that courts should consider in connection with a motion to transfer brought pursuant to 28 U.S.C. § 1404(a). These public and private interest factors include: (1) "the convenience of the parties as indicated by their relative physical and financial condition"; (2) "the convenience of the witnesses"; (3) "the location of books and records" that will be produced during discovery; and (4) "practical considerations that could make the trial easy, expeditious, or inexpensive." *Jumara*, 55 F.3d at 879.

In their memorandum in support of the Motion to Transfer ("Defs. Mem."), Defendants rely on the Donohue Declaration to argue that these public and private interest factors weigh in favor of transfer to the Eastern District of Missouri.[2] *Id.* at 9-11 (citing Donohue Declaration, at

---

[2] Although, at one point, Defendant's memorandum cites to the declaration of Jason K. Fagelman ("Fagelman Declaration")—which was also filed by Defendants in support of the Motion—the

¶¶ 6-7). As explained below, however, the Donohue Declaration is devoid of context crucial to this Court's evaluation of the Motion to Transfer.

There is also substantial reason to believe that the software platform that was breached (the "Software Platform") was designed and developed by Cognizant in New Jersey, which, if true, would weigh strongly against transfer to the Eastern District of Missouri. However, glaringly absent from Defendants' papers in support of the Motion to Transfer is a declaration from anyone employed by Cognizant, concerning Cognizant's role in the development and maintenance of the Software Platform. Therefore, the Court should permit Plaintiffs to engage in discovery to ascertain whether, and to what extent, Ms. Donohue's averments actually support transfer pursuant to 28 U.S.C. § 1404(a).

**A.    The Key Questions of Liability Relate to the Development and Design of Defendants' Software Platform**

Plaintiffs' allegations regarding root cause of the Data Breach highlight the deficiencies of the Donohue Declaration. Plaintiffs allege that the underlying cause of the Data Breach was Defendants' "affirmative [choices] to design the [Software Platform] with inadequate user authentication, security protocols, and privileges," as well as their "faulty patching and updating protocols," all of which "left Defendants' computer systems foreseeably vulnerable to criminals." *See, e.g.*, *Patterson v. Cognizant Technology Solutions Corp.*, No. 26-cv-02570 (D.N.J. Mar. 12, 2026), ECF No. 1, at ¶¶ 51, 77. The Data Breach was further exacerbated by Defendants' failures "to implement processes that would detect a breach of their data security systems in a timely manner," and "to segment data by, among other things, creating firewalls and access controls so

---

proposition for which the Fagelman Declaration is cited actually appears in the Donohue Declarations. As such, Defendants' citation to the Fagelman Declaration in connection with this argument appears to be in error.

that if one area of Defendants' network was compromised, hackers [could] not gain access to other portions of Defendants' systems." *See, e.g.*, *Patterson*, at ¶¶ 49, 50.

Put another way, Plaintiffs allege that, by developing and designing an inherently flawed Software Platform that "was rife with specific cybersecurity defects that should have been obvious to" Defendants, and then allowing these "vulnerabilities to go undiscovered and unresolved," Defendants left "consumers' data vulnerable to theft." *See, e.g.*, *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2176590, at *17 (D. Mass. 2025). Thus, the key questions relative to Defendants' liability will arise from their development and design of the Software Platform, and how the latent vulnerabilities therein allowed the Data Breach to occur. *See, e.g.*, *In re Blackbaud, Inc., Customer Data Sec. Breach Litig.*, 509 F. Supp. 3d 1362, 1364 (J.P.M.L. 2020); *Murray v. ILG Techs., LLC*, 798 Fed. App'x 486, 492 (11th Cir. 2020) ("[The plaintiffs'] negligence claims all stem from [the defendants'] failure to exercise due care in the design of the software utilized by [a third-party]."); *In re Soc. Media Adolescent Addiction/Pers. Injury Products Liab. Litig.*, 754 F. Supp. 3d 946, 978 (N.D. Cal. 2024) (noting that the plaintiffs' negligence claim related to the "intentional design choices" made by the defendants in designing its software).

In light of these allegations, the public and private interest factors articulated in *Jumara* will favor the forum in which the Software Platform was designed and developed—as opposed to the forum from which the Software Platform was distributed to end-users—because that forum is the one where most discovery will occur, where most witnesses will be located, and where this case's "center of gravity" will lie. This conclusion is supported by several analogous cases from a range of different areas of law.

For example, in *Yocham v. Novartis Pharmaceuticals Corp.*, 565 F. Supp. 2d 554 (D.N.J. 2008)—a products liability case—the court held that, although the plaintiff was injured in Texas,

4

the *Jumara* factors "weigh[ed] strongly against transferring the case" from New Jersey to Texas because "the product at the heart of [the] lawsuit was developed, tested, and marketed in New Jersey by a company with its corporate office in this state." *Yocham*, 565 F. Supp. at 559-560. Given that the instant action has a product liability aspect—with the "product defect [being] a software vulnerability that [was] susceptible to infiltration and infection"—the same logic would apply here. *See, e.g.*, *Beyer v. Symantec Corp.*, 2019 WL 935135, at *4 (N.D. Cal. 2019); *Portman v. Alza Corp.*, 2006 WL 1330029, at *2 (S.D.N.Y. 2006) ("The location of the design and manufacture of the product at issue in a products liability case is an important factor to consider in evaluating a transfer motion.").

Courts have reached similar conclusions in intellectual property cases involving software (and other products), holding that the relevant private and public interest factors strongly favor the forum in which the software/product at issue was developed and designed. *See, e.g.*, *Kaufman v. Salesforce.com, Inc.*, 2021 WL 1687378, at *9 (S.D.N.Y. 2021), *aff'd*, 2021 WL 2269552 (S.D.N.Y. 2021); *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 2015 WL 13064914, at *1 (D.N.J. 2015) (transferring case to the district where "the bulk of the defendant's engineering, development, product design, marketing, and sales activities originate[d] from"); *Lanard Toys Ltd. v. Toys R US-Delaware, Inc.*, 2015 WL 3794595, at *3-4 (D.N.J. 2015) ("The center of gravity of this dispute is in the [district] where the accused product was designed and developed."); *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 2001 WL 1242277, at *3 (S.D.N.Y. 2001) (similar); *see also Teva Pharmaceuticals USA, Inc. v. Sandoz Inc.*, 2017 WL 2269979, at *7 (D.N.J. 2017) (noting that a claim's "center of gravity" is the location where a "product was designed, developed, and tested"). This is particularly true if—like the Software Platform—a given product is sold in

many places but designed and developed in only one. *See Zenith Products Corp. v. Design Home Sols., LLC*, 2010 WL 2136569, at *5 (E.D. Pa. 2010).

Consistent with the foregoing, in data breach cases, the Judicial Panel on Multidistrict Litigation has also focused on the location of the defendant who actually developed and designed the software platform that was breached, instead of the location of other customer-facing defendants who merely utilized the platform. *See, e.g.*, *In re Samsung Customer Data Sec. Breach Litig.*, 655 F. Supp. 3d 1368, 1369 (J.P.M.L. 2023) (transferring related actions to the District of New Jersey because the defendant had its headquarters in New Jersey, and was "where common witnesses and other evidence likely [would] be found"); *In re MOVEit Customer Data Sec. Breach Litig.*, 699 F. Supp. 3d 1402, 1406-1407 (J.P.M.L. 2023); *In re Blackbaud*, 509 F. Supp. 3d at 1363-1364. Therefore, ascertaining the place where Defendants actually designed and developed the Software Platform is crucial to the Court's consideration of the Motion to Transfer.

**B.     Plaintiffs' Research Indicates That Defendants' Software Platform Was Likely Designed and Developed By Cognizant in New Jersey**

Although, in the Donohue Declaration, Donohue describes Cognizant as a mere "holding company," Donohue Declaration, at ¶ 6, Defendants' respective websites and marketing materials paints a starkly different picture. Indeed, as explained below, there is substantial reason to believe that the Software Platform was designed and developed by *Cognizant* in New Jersey, and that TPS functions primarily as a distributor of the Software Platform to end-users.

Specifically, on the page of Cognizant's website pertaining to the healthcare segment of its business, Cognizant represents itself as *the* company with whom end-users interface, and only refers to "TriZetto" within the context of describing particular software offerings that were developed by Cognizant through its partnerships with other software companies, such as Google,

6

Microsoft, Amazon, and Oracle.[3] That webpage further states that "*Cognizant* helps payers and providers operate more efficiently with digital solutions that reduce administrative friction," and touts "our [*i.e.*, Cognizant's] technology and expertise."[4] There is no mention of TPS's "digital solutions" or "technology." Cognizant also describes itself as "an AI builder and technology services provider, building the bridge between AI investment and enterprise value by *building* full-stack AI solutions for [its] clients,"[5] often referencing its "human-centric software approach" to "software collaboration and development."[6] Clearly Cognizant is not a mere "holding" company.

Cognizant also publicly represents that the TriZetto products are designed, offered, and managed by Cognizant itself, and frequently refers to the TriZetto products as "Cognizant's TriZetto" products.[7] For example, a press release from Cognizant entitled "Faster decisions, faster care for patients: Cognizant opens TriZetto Unify to AI agents" discusses *Cognizant's* development of "a new headless API model" for a software program named "TriZetto Unify"—which, in turn, is described as being "*Cognizant's* platform strategy that spans payer and provider

---

[3] *Healthcare Technology Solutions*, Cognizant, https://www.cognizant.com/us/en/industries/healthcare-technology-solutions (last viewed May 29, 2026); *see also*, *Healthcare Provider Digital Services 2025 Market Insights*, Avasant, https://www.cognizant.com/en_us/services/documents/cognizant-healthcare-provider-digital-services-2025-market-insights.pdf (last viewed May 29, 2026).

[4] *Id*. (emphasis added).

[5] *Id*. (emphasis added).

[6] *Corporate Overview Q4 2025*, Cognizant, https://www.cognizant.com/en_us/about/documents/cognizant-q4-2025-corporate-overview.pdf (last viewed May 29, 2026).

[7] *See, e.g.*, *Cognizant – TriZetto Elements Suite*, Cognizant, https://www.cognizant.com/en_us/trizetto/documents/trizetto-elements-suite-data-sheet.pdf (last viewed May 29, 2026); *Healthcare Technology Solutions*, Cognizant, https://www.cognizant.com/us/en/industries/healthcare-technology-solutions (last viewed May 29, 2026); *Cognizant—TriZetto Government Programs*, Cognizant, https://www.cognizant.com/en_us/trizetto/documents/government-programs-ebook.pdf (last viewed May 29, 2026).

7

workflows."[8] Other documents available on Cognizant's website discuss how Cognizant collaborated with other software companies like Google and Microsoft to develop and improve TriZetto software products, as well as Cognizant's investments in enhancements to those products.[9] Cognizant is heavily involved and designing all of its software platforms, even if they are under the TriZetto product name.

In contrast, TPS's website portrays TPS as primarily being a consulting/staffing agency that provides certain *services* to its clients.[10] For example, TPS's website claims that hiring TPS allows its clients to "eliminate the need to hire and manage" certain types of clerical employees because they can instead rely on TPS's "team of in-house experts" to "handle critical back office tasks," "reduce the risk of rejected or denied claims," and "go to bat for you and your revenue" when it comes to obtaining reimbursement from insurers.[11]

Moreover, insofar as TPS's website references software, it is either within the context of offering to assist clients the *implementation* (*e.g.*, installation and initial set up) of software developed by third-party companies such as Epic,[12] or framed as being supplemental to consulting

---

[8] *Faster decisions, faster care for patients: Cognizant opens TriZetto Unify to AI agents,* COGNIZANT, https://news.cognizant.com/2026-05-29-Faster-decisions,-faster-care-for-patients-Cognizant-opens-TriZetto-Unify-to-AI-agents (last viewed May 29, 2026).

[9] *See, e.g.*, *Everest Group Utilization Management (UM) Operations PEAK Matrix Assessment 2025*, PEAK MATRIX, https://www.cognizant.com/en_us/industries/documents/cognizant-everest-group-utilization-management-operations-peak-matrix-assessment-2025.pdf (last viewed May 29, 2026).

[10] *See, e.g.*, *Explore Our Solutions*, TRIZETTO PROVIDER SOLUTIONS, https://www.trizettoprovider.com/solutions/revenue-cycle-management-services (last viewed May 29, 2026); *Billing Services*, TRIZETTO PROVIDER SOLUTIONS, https://www.trizettoprovider.com/who-we-serve/billing-services (last viewed May 29, 2026).

[11] *Id*.

[12] *See, e.g.*, *Health Systems*, TRIZETTO PROVIDER SOLUTIONS, https://www.trizettoprovider.com/who-we-serve/health-systems (last viewed May 29, 2026).

services that TPS provides to its clients and, notably, "fueled by Cognizant."[13] TPS does not claim

to have developed any of the software programs it offers; to the contrary, TPS directs physicians

to contact Cognizant for technical support.[14] Thus, TPS services appear to be similar to consulting

services offered by the "Big Four" accounting firms, which frequently come bundled with software

programs created and developed by other, third-party companies.[15]

Finally, and perhaps most tellingly, Cognizant's website features a job posting for a

software engineer position in Cognizant's healthcare technology line of business which

contemplates working "3 or 5 days per week in a Cognizant office in New Jersey"—specifically,

Teaneck, New Jersey, where Cognizant is headquartered. *See* screenshot of job posting from

Cognizant website, attached hereto as Exhibit A. This further supports Plaintiffs' belief that the

Software Platform at issue in this case was likely designed and developed by Cognizant in New

Jersey, and that TPS's role was limited to distributing the Software Platform as part of its

consulting business.

    **C.**    **The Donohue Declaration Fails to Establish Where Defendants' Software Platform Was Designed and Developed**

Despite its importance to the Motion to Transfer, the carefully worded Donohue

Declaration says nothing about where the software platform at issue in this case was designed or

developed. For example, while Ms. Donohue describes TPS as "a healthcare technology company

that *provides* revenue cycle management and related software services to healthcare

---

[13] *The TriZetto Provider Solutions Story*, TRIZETTO PROVIDER SOLUTIONS, https://www.trizettoprovider.com/who-we-are/our-story (last viewed May 29, 2026).

[14] *Contact Us*, TRIZETTO PROVIDER SOLUTIONS, https://www.trizettoprovider.com/contact-us (last viewed May 29, 2026).

[15] *See, e.g.*, https://www.pwc.com/us/en/technology/alliances/sap-implementation.html (touting the "alliance" between PricewaterhouseCoopers and German software company SAP and how "PwC can enable SAP solutions to meet [clients'] business goals"); https://www.accenture.com/us-en/services/ecosystem-partners/salesforce (touting Accenture's use of Salesforce software as part of the consulting services it provides).

organizations," she stops short of claiming that those software services were designed or developed by TPS. Donohue Declaration, at ¶ 3 (emphasis added). If TPS designed the Software Platform, Donahue would have said so.

Ms. Donohue's assertion that "TPS is a separately incorporated entity with its own operating agreement, its own officers, its own books and records, its own financial accounts, and its own contractual relationships," Donohue Declaration, at ¶ 6, is *consistent* with Plaintiffs' understanding of the relationship between the two entities. Indeed, Plaintiffs view the relationship between Cognizant and TPS as analogous to the relationship between an automobile manufacturer and a car dealership in that Cognizant designs and develops software, and then relies on subsidiaries like TPS to actually distribute it. If so, it would not be surprising (or significant) that Cognizant and TPS are legally distinct entities, nor would there be any need for Cognizant to be involved in "any day-to-day operations relevant to the software services TPS provides" or enter into "contracts with any of the healthcare organizations that use TPS's services." Donohue Declaration, at ¶ 6.

In sum, the Donohue Declaration fails to address important aspects of the relationship between Cognizant and TPS that bear directly on the Motion to Transfer. Additionally, as noted above, Defendants do not provide a declaration from any Cognizant employee or officer. Based on the information above, from Defendants' own public statements, the omission of a declaration from Cognizant is likely because Cognizant was deeply involved in the development of the Software Platform from its headquarters in New Jersey. Plaintiffs should be permitted to conduct discovery on these issues so that the Court can be fully informed of all relevant facts before deciding the Motion to Transfer.

## III.    CONCLUSION

For the reasons set forth herein, the Court should enter an order permitting Plaintiffs to engage in discovery regarding the relationship between Cognizant and TPS, where the Software Platform was designed and developed, and any other issues relevant to the pending Motion to Transfer.

Dated: June 1, 2026.

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**

By:    /s/ *Jason H. Alperstein*
    JASON H. ALPERSTEIN

James E. Cecchi
Jason H. Alperstein
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carellabyrne.com

Bryan L. Clobes
Nickolas J. Hagman (*pro hac vice*)
**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, IL 60603
bclobes@caffertyclobes.com
nhagman@caffertyclobes.com

Thomas E. Loeser (*pro hac vice*)
**COTCHETT PITRE & MCCARTHY LLP**
1809 7th Avenue, Suite 1610
Seatle, WA 98101
Tel.: (206) 802-1272
tloeser@cpmlegal.com

Ashley M. Crooks
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
acrooks@hausfeld.com

11

*Attorneys for Plaintiffs and the Proposed Class*